In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00121-CV


______________________________




PACIFIC EMPLOYERS INSURANCE COMPANY, Appellant



V.



JIMMY I. BROWN, Appellee




 


On Appeal from the 5th Judicial District Court


Cass County, Texas


Trial Court No. 98-C-122




 





Before Grant, Ross, and Cornelius,* JJ.

Opinion by Justice Grant



______________

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment

O P I N I O N



 Pacific Employers Insurance Company, the workers' compensation insurance carrier for the
employer of the defendant, Jimmy I. Brown, an injured worker, appeals the trial court's judgment 
that Brown have and recover indemnity benefits from Pacific accruing as a result of a seventeen
percent impairment rating. Pacific filed suit for the trial court to determine the limited issue of the
correct impairment rating after the appeals panel affirmed the contested case hearing officer's
impairment rating determined at the Texas Workers' Compensation Commission's (referred to as
TWCC or the Commission) benefit review conference and contested case hearing. 

 Pacific contends the judgment should be reformed to conform with the thirteen percent
impairment rating the trial court stated in its Findings of Facts and Conclusions of Law. Pacific
contends the trial court erred as a matter of law in assigning an impairment rating of seventeen
percent in its judgment. Pacific contends the preponderance of the evidence at trial supports the
thirteen percent impairment rating. Pacific also contends the trial court properly disregarded the
TWCC's contested case hearing officer and appeals panel's improper sixteen percent rating arrived
at by adding an additional three percent to the impairment rating certified by the designated doctor. 

 Brown sustained a compensable back injury on November 14, 1994. After several surgical
procedures, Brown's treating doctor, Dr. Jeffery T. DeHaan, referred him to Dr. Barry Green for
Dr. Green to perform a certifying examination to determine if Brown had reached maximum medical
improvement (MMI) and, if so, to determine his impairment rating, the percentage of permanent
impairment of the whole body resulting from a compensable injury. See Tex. Lab. Code Ann.
§ 401.011(24) (Vernon Supp. 2002); 28 Tex. Admin. Code § 130.1 (2002). 

 Dr. Green performed the examination on September 17, 1996, in which he certified that
Brown had reached MMI on that date, and he assigned Brown a thirteen percent impairment rating.

 When Brown disputed Dr. Green's rating at a benefit review conference, Dr. Joseph
Greenspan was appointed to serve as the Commission's selected designated doctor. Dr. Greenspan
performed a certifying examination on October 14, 1996, and assigned Brown an impairment rating
of seventeen percent. 

 On behalf of Pacific, Intracorp (1) reviewed Dr. Greenspan's impairment rating report and
determined that he had failed to convert the impairment for sensory deficits to a whole person
percentage as required by the American Medical Association (AMA) Guides and that, properly
converted, the rating should have been thirteen percent. Dr. Greenspan reviewed the Intracorp report
and stated in a letter to the Commission dated January 14, 1997, that he agreed the impairment rating
should be thirteen, not seventeen, percent. 

 Dr. DeHaan commented on Dr. Greenspan's rating, at the request of the Commission, and
concluded that "17% or 18% would be appropriate but certainly not 13%."

 At the contested case hearing, the hearing officer focused his attention on Dr. Greenspan's
invalidation of lumbar lateral flexion range of motion, which Dr. Greenspan explained in his report
as having been invalidated by the result of the straight leg testing, and the officer requested
clarification from Dr. Greenspan. Dr. Greenspan responded by letter dated October 20, 1997, that
the invalidation was based on the deviation of greater than ten percent and five degrees. As
requested, Dr. Greenspan provided that if the lumbar lateral flexion range of motion had not been
invalidated, the impairment rating would be sixteen percent, but stated that he did not feel this rating
was warranted. The hearing officer found that Dr. Greenspan had misapplied the AMA Guides in
not awarding the additional three percent and found that the revised impairment rating of sixteen
percent was not outweighed by the great weight of the other medical evidence and was entitled to
presumptive weight. 

 The appeals panel affirmed the hearing officer's determination of sixteen percent because the
panel applied a previous administrative ruling that the straight leg raising test does not invalidate
lumbar lateral flexion range of motion, and it found no other basis for Dr. Greenspan's invalidation. 
 Pacific filed for judicial review of the appeals panel's decision regarding the percentage of
impairment. The trial court received evidence at trial and took the matter under advisement. The
trial court then sent a letter to the parties outlining the trial court's decision and the reasoning
underlying the decision, and requesting the parties to draft and submit a judgment for a seventeen
percent impairment rating. Pacific prepared and the trial court, on February 26, 2001, signed a
judgment stating 

 The Court, after hearing the evidence and arguments of counsel, is of the
opinion that the Defendant is entitled to recover of and from the Plaintiff indemnity
benefits accruing as a result of a 17% impairment rating. 


 IT IS THEREFORE ORDERED by the Court that Defendant have and
recover indemnity benefits from Plaintiff accruing as a result of a 17% impairment
rating.


 After Pacific submitted a motion to set aside the judgment as void for not having provided
the TWCC with notice of the proposed judgment, on March 19, 2001, the appropriate notice was
provided. The TWCC did not intervene to contest the judgment of seventeen percent, and the trial
court signed another judgment identical to the first on May 21, 2001. 

 On June 6, 2001, however, Pacific requested the trial court to file findings of fact and
conclusions of law pursuant to Tex. R. Civ. P. 297. Pacific drafted findings and conclusions it
believed the evidence supported and submitted them to the trial court. On June 19, 2001, the trial
court signed the findings and conclusions submitted by Pacific, which contained a solitary sentence,
"Jimmy I. Brown's impairment rating is 13%," repeated under both the headings of "Findings of
Fact" and "Conclusions of Law." There were no other findings of fact or conclusions of law issued
and no amended or supplemental findings of fact or conclusions of law requested.

 Pacific contends the judgment should be reformed to reflect the trial court's Findings of Fact
and Conclusions of Law that Brown's impairment rating is thirteen percent. Pacific argues that,
pursuant to Tex. R. Civ. P. 299a, when findings of fact obtained pursuant to Tex. R. Civ. P. 297 are
contradictory to the judgment, the findings of fact control in appellate matters.

 First, Pacific misstates the rule. Rule 299a states in part, "Findings of fact shall not be recited
in a judgment. If there is a conflict between findings of fact recited in a judgment in violation of this
rule and findings of fact made pursuant to Rules 297 and 298, the latter findings will control for
appellate purposes." 

 Findings of fact are ultimate determinations of what specifically occurred, who did or did not
do certain acts, what the values of services and property are worth, and the answer to any other
specific inquiry necessary to establish conduct or the existence or nonexistence of a relevant matter. 
On the other hand, conclusions of law may be a statement of a principle of law or the application of
the law to the ultimate facts in the case. 

 The prohibition of placing the findings of fact in the judgment was intended to require that
the judgment state the specific legal status or rights and declare and recognize enforceability of those
rights. If a judgment mentions an ultimate fact in such a legal declaration of rights, this is not the
equivalent of a finding of fact, but rather is necessary to make a legal declaration of the rights of the
parties. 

 This case presents an example of the necessity of the judgment stating what is also an
ultimate fact. The ultimate fact was a determination of the percentage of disability the worker
suffered during the course of his employment. The judgment recites that ultimate fact in giving legal
status to the worker's entitlement to receive benefits on the basis of that degree of disability. Thus,
although the ultimate fact is a fact-finding, the application of that fact in the judgment represents a
different purpose under the law. 

 Thus, the inclusion of seventeen percent in the judgment was not a finding of fact stated in
the judgment in violation of Rule 299a. Because it was not, we are not presented with the situation
Rule 299a resolves, determining whether the findings stated in the judgment or the findings filed
pursuant to Rule 297 control for appellate purposes. Therefore, Rule 299a does not apply. Thus,
we will not reform the judgment to read thirteen percent under Rule 299a. Pacific's first point of
error is overruled.

 We are left with a judgment stating the impairment rating as seventeen percent and a Finding
of Fact and Conclusion of Law stating the impairment rating as thirteen percent. Thus, the finding
and conclusion made pursuant to Rules 297 and 298 do not support the judgment. 

 When the findings of fact do not support the judgment, the judgment should either be
reformed to conform to the findings, or if appropriate, it should be reversed. See 6 McDonald &
Carlson: Texas Civil Practice, § 18:14 (2d ed. 1998 & Supp. 2001). Tex. R. App. P. 43.2
provides that the court of appeals may reverse and remand for further proceedings. When reversing
a trial court's judgment, the court need not render the judgment the trial court should have rendered
when the interests of justice require a remand for another trial. Tex. R. App. P. 43.3. 

 In determining what action is appropriate in this case, we shall consider the peculiar
circumstances.

 Rule 300 states that where conclusions of fact found by the judge are separately stated, the
court shall render judgment thereon unless set aside or a new trial is granted. Rule 299 states that
when findings of fact are filed by the trial court, they shall form the basis of the judgment on all
grounds of recovery or defense. Rule 299a, discussed above, resolves conflicts between factual
findings stated in the judgment and findings made pursuant to Rules 297 and 298 in favor of the
findings stated separately and at the request of the parties. However, none of these rules appear to
contemplate the situation with which we are faced. 

 While Rule 296 allows parties to request the trial court to state in writing its findings and
conclusions, and Rule 297 specifies the time in which the trial court must make such findings after
the request has been made, the rules do not prohibit the trial court from stating such findings and
conclusions in the absence of such a request. Rule 299a requires that the findings shall not be recited
in a judgment and only resolves conflicts between findings stated in the judgment and findings filed
pursuant to Rules 297 and 298; it does not resolve any conflict that may arise between findings and
conclusions stated separately, sua sponte, by the trial court before a request under Rule 296.

 We recognize the many cases holding that a letter written by the trial court before judgment
is not competent evidence of the basis for the trial court's judgment. See Cherokee Water Co. v.
Gregg County Appraisal Dist., 801 S.W.2d 872 (Tex. 1990); Reagan v. Marathon Oil Co., 50
S.W.3d 70, 76 (Tex. App.-Waco 2001, no pet.) (stating a prejudgment letter is not evidence of the
court's ruling where appellant attempted to import terms into the judgment from the letter). In
Cherokee Water Co., the court was not faced with formally filed findings that did not support the
judgment, but a conflict between formally filed findings and a prejudgment letter from the trial court
regarding the basis of the judgment. See Cherokee Water Co., 801 S.W.2d 872. The court held the
letter was not competent evidence of the trial court's basis for judgment and that the letter, written
before judgment, was not a finding of fact as contemplated by Rules 296-299 of the Texas Rules of
Civil Procedure. Id. at 878. The court found there was evidence to support the trial court's decision
on other grounds supported by the formal findings. Id. The court in Cherokee cited Brazos for these
propositions, explaining why the trial court's letter would not be competent evidence of the grounds
for rendering the judgment because the trial court may have in the interim been dissuaded from those
grounds and yet entered the same judgment on different grounds. Brazos River Auth. v. Gilliam, 429
S.W.2d 949, 953-54 (Tex. Civ. App. -Fort Worth 1968, writ ref'd n.r.e.). 

 We are not confronted with formal findings even purporting to support the judgment on
different grounds. If the trial court's findings contained in the letter in this case are not findings
contemplated under Rules 296-299 because the letter was written five days before the judgment was
signed, it is at least evidence suggesting that the trial court intended to render judgment for seventeen
percent and that the figure, seventeen percent, contained in the judgment was not a clerical error. 

 The purpose of findings and conclusions separately stated is to inform the appellate court of
the factual determinations the trial court made, as the finder of fact, and to indicate on what legal
grounds the trial court rendered judgment. Such findings assist the appellate court in its review. 
Such findings also assist the parties in narrowing the focus of their points of error on appeal. 
However, although such findings might not be stated in writing by the trial court before rendition
of judgment, it is inherent in rendering judgment that such findings have already been made mentally
by the judge. That is why, when there are no findings filed, it is presumed the judgment is supported
by the evidence.

 The rules regarding filed findings and conclusions were not intended to provide the trial court
with a mechanism to alter its judgment. In this case, we are confronted with a conflict between
findings and conclusions stated separately in a letter to the parties before judgment was rendered,
requesting that such judgment be prepared for rendition, and findings prepared by the losing party,
the party who prepared the judgment stating seventeen percent at the trial court's request, which
Pacific admits drafting based not on the letter instructions of the trial court, but on Pacific's own
judgment of what findings the evidence supported, pursuant to Rule 300, the trial court rendered
judgment on its conclusions of fact, separately stated, pursuant to Rule 299a, and mailed to the
parties, pursuant to Rule 297. The conflict arose when the trial court subsequently signed conflicting
findings prepared by Pacific. Even if the trial court's letter to the parties is not competent evidence
of the ground for the trial court's ruling, we cannot ignore that conflict presented by the letter. 

 In this case, we are also confronted with another policy consideration. Tex. R. Civ. P. 820
expressly adopts all portions of the workers' compensation law relating to matters of practice and
procedure. One such statute provides that the party initiating the judicial review of an appeals panel
decision regarding workers' compensation benefits must file any proposed judgment or settlement
with the executive director of the Commission not later than the thirtieth day before the date on
which the court is scheduled to render the judgment or approve the settlement. Tex. Lab. Code
Ann. § 410.258 (Vernon Supp. 2002). The Commission shall review the proposed judgment or
settlement to determine compliance with all appropriate provisions of the law and may intervene not
later than the thirtieth day after the date of receipt of the proposed judgment or settlement to inform
the court of each reason the Commission believes the proposed judgment or settlement is not in
compliance with the law. Id. The court shall give full consideration to the information provided by
the Commission. Id. Any judgment rendered or settlement approved without complying with these
requirements is void. Id. The statute only refers to proposed judgments and settlements and does
not explicitly require that a party provide the TWCC with notice of requested findings of fact and
conclusions of law. 

 Tex. R. Civ. P. 297 requires that judges file findings of fact and conclusions of law within
twenty days after a timely request has been filed. Pacific was not required to provide the TWCC
with notice of the requested findings of fact, and the findings are not void due to this failure. 
However, because the TWCC did not receive notice of the judgment that the trial court's Findings
of Fact and Conclusion of Law support, to which the judgment might otherwise be modified, it
would run contrary to the intent of this statute for us to modify or reform the judgment to conform
to the filed findings and affirm the judgment as modified or for us to reverse and render a judgment
of thirteen percent in accordance with the filed findings. 

 Under the circumstances of this case, it is appropriate and in the interest of justice to reverse
and remand for a new trial.

 In the interest of judicial economy, we will also address Pacific's contention that there is no
basis in law to support a judgment of seventeen percent and that the preponderance of the evidence
supports thirteen percent. The trial court could not have chosen sixteen percent, and therefore the
trial court, as a matter of law, could only have rendered judgment for thirteen percent. 

 When the Commission's final decision is appealed to the courts, it is subject to a modified
de novo review by the trier of fact. Tex. Workers' Comp. Comm'n v. Garcia, 893 S.W.2d 504, 515
(Tex. 1995). The appealing party has the burden of proof by a preponderance of the evidence. Tex.
Lab. Code Ann. § 410.303 (Vernon 1996). Only issues timely presented and preserved through the
TWCC dispute process under Chapter 410 of the Texas Labor Code may be presented at a trial under
Chapter 410. Tex. Lab. Code Ann. § 410.302 (Vernon 1996). 

 In determining the extent of impairment, while the trier of fact is not required to accord any
special weight to either the Commission's decision or the rating determination of the designated
doctor (that doctor appointed by mutual agreement of the parties or by the Commission to make an
independent determination of impairment), the trier of fact must adopt the specific rating of one of
the physicians in the case. Tex. Lab. Code Ann. § 401.011(15) (Vernon Supp. 2002),
§§ 408.122(c), 408.125, 410.302, 410.306(c) (Vernon 1996); Garcia, 893 S.W.2d at 528. All
impairment ratings must be assigned by doctors based on a review of medical records and a
certifying physical examination performed explicitly to determine MMI and an impairment rating. 
Tex. Lab. Code Ann. § 408.124 (Vernon Supp. 2002); 28 Tex. Admin. Code § 130.1(b)(2), (4)(B). 
When the evaluation of impairment rating is performed by a doctor other than the treating doctor,
the results of the examination shall be submitted to the treating doctor, who shall then indicate
agreement or disagreement with the evaluation. Tex. Lab. Code Ann. § 408.123 (Vernon 1996). 

 Two doctors suggested a seventeen percent impairment rating. Dr. Greenspan certified an
impairment rating of seventeen percent in his initial report to the Commission. However,
Dr. Greenspan subsequently revised his report to reflect a thirteen percent impairment rating, based
on errors in his calculation that were pointed out to him, and disavowed his initial seventeen percent
rating. 

 In his letter to the Commission commenting on the controversy stemming from
Dr. Greenspan's initial seventeen percent rating and Dr. Green's thirteen percent rating, Dr. DeHaan
indicated he considered seventeen percent to be more accurate. Dr. DeHaan supported this opinion
by doing his own cursory calculation, using his knowledge of the patient's medical history and some
tables, presumably from some edition of the AMA Guides. He demonstrated that with that
information, one arrived at an eighteen percent total whole person impairment. Based on this
calculation he stated, "I think 17% or 18% would be appropriate, but certainly not 13% which was
mentioned previously." Although Dr. DeHaan stated he thought Dr. Greenspan's seventeen percent
rating would be more accurate, he also indicated he did not think that either Dr. Green or
Dr. Greenspan had adequately addressed Brown's leg pathology. 

 Because Dr. DeHaan was Brown's treating physician, the Texas Workers' Compensation Act
provided that he indicate his agreement or disagreement with the certification and evaluation
performed by a doctor other than him. Tex. Lab. Code Ann. § 408.123. However, nothing in the
Act or the TWCC Administrative Rules provides for a treating physician to assign an impairment
rating when the treating physician is not the certifying doctor. In other words, a treating physician
must meet the same requirements as any other physician in order to assign an impairment rating. 
These requirements include more than having examined the employee at some point in time. 

 The requirements for assigning an impairment rating include performing a complete medical
examination of the employee for the explicit purpose of determining MMI, 28 Tex. Admin. Code
§ 30.1(b)(4)(B) (2002); certifying the employee has reached MMI, 28 Tex. Admin. Code
§ 130.1(c)(2) (2002); identifying, documenting, and analyzing objective clinical or laboratory
findings of permanent impairment for the current compensable injury, 28 Tex. Admin. Code 
§ 130.1(c)(3) (2002); comparing the results of the analysis with the impairment criteria and
providing the following: a description and explanation of specific clinical findings related to each
impairment, including zero percent impairment ratings, a description of how the findings relate to
and compare with the criteria described in the AMA Guides, and explaining any inability to obtain
the required measurements, 28 Tex. Admin. Code § 130.1(c)(3)(D) (2002). The doctor assigning
the impairment rating shall assign one whole body impairment rating for the current compensable
injury. 28 Tex. Admin. Code § 130.1(c)(3)(E). 

 In addition, in order to certify MMI and assign an impairment rating for the current
compensable injury, the certifying doctor is required to complete, sign, and submit the report of
medical evaluation and a narrative report to the Commission and the parties involved within a certain
time frame. 28 Tex. Admin. Code § 130.1(d). The narrative report must include the date of the
certifying examination; the date of MMI; findings of the certifying examination, including both
normal and abnormal findings and an explanation of the analysis performed to find whether MMI
was reached; a narrative history of the medical condition that outlines the course of the injury and
correlates the injury to the medical treatment; the current clinical status; diagnosis and clinical
findings of permanent impairment as stated above; and the edition of the AMA Guides used in
assigning the impairment rating. Id. 

 There is no indication that Dr. DeHaan assigned a seventeen percent impairment rating and
no evidence that Dr. DeHaan or his letter met the requirements for assigning Brown an impairment
rating. Because a doctor assigning an impairment rating is required to assign one whole body
impairment rating, Dr. DeHaan's statement that he thought seventeen or eighteen percent would be
appropriate was not a proper assignment. Nor would his statement that he considered seventeen
percent to be more accurate constitute a rating, as it indicates only his opinion as to which previously
assigned rating was more accurate. The only percentage Dr. DeHaan mentioned that was supported
by his own calculations was the eighteen percent whole person impairment. 

 Besides the overwhelming indication, from the context of the letter, that Dr. DeHaan
intended to express his concern regarding both doctors' ratings and his opinion as to which was more
accurate and did not intend to assign a rating himself, there is no evidence that Dr. DeHaan met the
requirements for assigning Brown an impairment rating. There is no evidence Dr. DeHaan based
his calculation of impairment on both the employee's medical records and a certifying examination
he performed explicitly for determining MMI, as no such examination is mentioned. Dr. DeHaan's
letter does not include the substantive requirements of the narrative report. There is also no
indication that Dr. DeHaan's letter was submitted to the insurance carrier. 

 The seventeen percent mentioned by Dr. DeHaan could not constitute a specific rating the
trial court could adopt, nor could Dr. DeHaan's letter constitute an assignment of impairment rating. 
It could only serve to provide the trial court information with which to evaluate the assigned ratings
of Dr. Green and Dr. Greenspan. 

 Pacific contends that because the trial court had to adopt a rating assigned by a doctor in the
case, and because the only doctors assigning a rating both assigned thirteen percent ratings, the trial
court, as a matter of law, could only have found an impairment rating of thirteen percent. In
evaluating this contention, we must necessarily decide whether the trial court would have the
authority to determine that the percentage of impairment rating was a number other than one
assigned by one of the doctors in the case.

 The Texas Workers' Compensation Act requires the trial court to adopt one of the impairment
ratings assigned by the doctors in the case. Tex. Lab. Code Ann. § 410.306(c). The Act also
provides that the Commission must adopt the impairment rating of one of the doctors, giving the
designated doctor's rating presumptive weight. Tex. Lab. Code Ann. § 408.125(c) (Vernon Supp.
2002). While this indicates the rating adopted by the Commission will normally be one available
for the trial court to adopt, the Act does not provide that the trial court may adopt the impairment
rating assigned by the Commission when its impairment rating is different than those assigned by
the doctors. Therefore, if the trial court has the authority to determine that the percentage of
impairment is other than that assigned by one of the doctors, it cannot do so based solely on the
ground that the Commission has introduced a different impairment rating. 

 The court in Garcia, 893 S.W.2d 504, stated that the jury, presented with assigned ratings
of ten, fourteen, and twenty, would have to return one of those numbers, not sixteen percent, as its
verdict. However, the court in Old Republic Ins. Co. v. Rodriguez, 966 S.W.2d 208 (Tex. App.-El
Paso 1998, no pet.), found that the example provided in Garcia addressed compromise verdicts and
was not intended to prohibit the fact-finder from accepting a doctor's findings with a correction for
a minor clerical error for which evidence was presented. In Rodriguez, the assigning doctor had
passed away and another doctor, testifying as to the findings on which the assignment was based,
agreed that a clerical error had been made. Id. at 210. The assigning doctor had added two numbers
together instead of applying the AMA Guides to their addition, which would have resulted in a
different sum. Id. The court in Rodriguez stated that such a minor clerical error would not render
an assignment invalid when the substance of the evaluation and the resulting impairment rating were
not shown to be invalid pursuant to AMA Guides. Id.

 In the present case, evidence was presented to the trial court regarding the Commission's
belief that Dr. Greenspan had incorrectly invalidated the left lateral flexion measurements and that
without such invalidation Dr. Greenspan had said the impairment rating would have been sixteen
percent. The error, if there was one, would have been made either in applying the Administrative
Code or the AMA Guides to the numerical results obtained in the physical examination. It is
possible that this type of error would not involve the performance of the clinical examination or the
professional judgment of the doctor, only the application of the Code and the Guides to the clinical
results. These are tasks which may be objectively evaluated and corrected and are thus analogous
to the clerical errors corrected by the jury in Rodriguez. If the trial court finds, based on evidence
in the record, that Dr. Greenspan miscalculated based on the requirement of the Administrative Code
and the AMA Guides, the court may correct such error in concluding the proper impairment rating. 
Without further determinations by the trial court, we cannot hold that the trial court, as a matter of
law, could have only found a thirteen percent impairment rating based on the record in this case. 

 In the interest of justice, the judgment of the trial court is reversed, and the case is remanded
for a new trial.




 Ben Z. Grant

 Justice


Date Submitted: May 16, 2002

Date Decided: September 17, 2002


Publish
1. The record does not contain any information about this organization.



lsen were barred from bringing their claims in a subsequent action, Madera is
barred by res judicata from bringing its claim in state court. Therefore, summary judgment was
appropriate for ARCO on the basis of res judicata.

Summary Judgment for the non-ARCO Appellees

 Madera contends the summary judgment was inappropriate as to W&B, CWR, Westerman,
WRC, and the Estate (the non-ARCO Appellees) based on res judicata. We have discussed earlier
the requirements to establish the defense of res judicata. The issue relevant to the non-ARCO
Appellees is whether there was privity between these Appellees and ARCO.

 Madera contends it was unaware of the conveyance of the optioned property to the Appellees
at the time it brought the federal action and thus was deprived of its right to litigate against those
parties. However, Madera suggests in its Third Amended Complaint in the federal proceeding that
"ARCO has entered into negotiations, agreements and/or understandings with undisclosed persons
and/or entities for the development of the Deep Rights which Plaintiff is entitled to earn." At a later
point in the federal proceedings, it sought to bring these parties into the action, but the federal court
refused at that point in the trial to allow the parties to be brought in. This court cannot review the
federal court's action in excluding these parties at the later point in the trial. If the federal trial court's
action was in error, then Madera could have appealed to the appropriate federal appellate court. No
appeal was taken.

 The federal action arose from the same subject matter, being the underlying agreement
between Madera and ARCO. One of the ways a party can be in privity with another party is that they
can be successors in interest. The claim against the non-ARCO Appellees was based on their claims
as successors in interest in the deep mineral rights. In the case of Amstadt v. United States Brass
Corp., the Supreme Court, quoting Kirby Lumber Corp. v. Southern Lumber Co., defined privity as
"the mutual or successive relationship to the same rights of property." Amstadt, 919 S.W.2d at 653;
Kirby Lumber Corp. v. S. Lumber Co., 145 Tex. 151, 196 S.W.2d 387, 388 (1946) (quoting Cain v.
Balcom, 130 Tex. 497, 109 S.W.2d 1044, 1046 (1937). In the present case, although the causes of
action are not identical, the right of ownership of the mineral interest involved is the identical subject
matter.

 We hold that the non-ARCO Appellees are in privity with ARCO so that the summary
judgment was appropriate on that basis.

 The judgment of the trial court is affirmed. 




 Ben Z. Grant*

 Justice


*Justice, Retired, Sitting by Assignment


Date Submitted: April 11, 2002

Date Decided: March 13, 2003


1. Although the Court in Hitchcock discussed a real estate option within the context of the Real
Estate Licensing Act, it also stated that: "[g]iven the nature of an option's relation to and limitation
over the land optioned, it is no less logically included in the definition of an 'interest' in land, than
is, for example, an easement, or royalty interest, or a contingent future interest." Hitchcock Props.
v. Levering, 776 S.W.2d 236, 238 (Tex. 1976).